ERIE R. CO. v. JACOBUS.

(Circuit Court of Appeals, Third Circuit. April 1, 1915.)

No. 1918.

1. COMMERCE ⊙⟼27—LIABILITY FOR INJURIES—STATUTORY PROVISIONS—"COMMON CARRIER BY RAILROAD."

Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, §§ 8657-8665), the title of which recites that it is an act relating to the liability of common carriers by railroad to their employés, and which makes common carriers by railroad, while engaged in interstate commerce, liable for the injury or death of any employé from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency due to negligence in its "cars, * * * boats, wharves, or other equipment," applied to injuries sustained by an employé on a tugboat of a railroad company used, in the business of continuing or completing interstate traffic, to move floats, on which cars loaded with freight were run, between points about New York Harbor, as, in view of the history of congressional enactments upon the subject, the expression "by railroad" is descriptive of the kind of common carriers to which the statute relates, distinguishes them from common carriers of other classes, and describes the kind of employers and employés charged with and protected by the provisions of that act.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ⊙⟼27.]

2. COMMERCE ⊙⟼27—LIABILITY FOR INJURIES—STATUTORY PROVISIONS.

Employers' Liability Act April 22, 1908, applies only to injuries occurring when the particular service in which the employé is injured is a part of interstate commerce; the test being whether the employé at the time of his injury was employed by a carrier then engaged in interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ⊙⟼27.]

3. MASTER AND SERVANT ⊙⟼284—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.

In an action for injuries sustained by an employé on a tugboat of a railroad company, while it was tying up at its home dock, where defendant's evidence tended to show that, after moving a loaded float from a pier in the East River to a dock in Jersey City, the tug in default of

further orders moved light to its home dock, there to await further orders, while that for plaintiff showed that the tug, after moving freight from New Jersey to New York, returned to its New Jersey home dock for the purpose of taking another tow therefrom to a point in New York, and was backing into the slip when the accident occurred, because the float was not ready, the question whether the employé was employed and the railroad company engaged in interstate commerce at the time of the accident was properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1000–1090, 1092–1132; Dec. Dig. ☞284.]

4. COMMERCE ☞27—MASTER AND SERVANT ☞291—LIABILITY FOR INJURIES—STATUTORY PROVISIONS.

A railroad company's tugboat, used in moving freight between different points about New York Harbor, was engaged in interstate commerce while tying up at its New Jersey home dock, if the act of tying up constituted the last act in a transaction of interstate commerce, or the first act preliminary and necessary to such a transaction, and hence the court did not err in charging that, if the boat was engaged in towing or transporting articles of commerce from one state to another, an employé thereon was engaged in interstate commerce; that his engagement did not end until the particular job was completed, and that it was not completed if he had further orders to execute until he returned to the home dock or his headquarters, if necessary to return there to execute an additional order; that if it was sent to transport an interstate shipment, and if it had no further orders, the employé was still engaged in interstate commerce, until he came back to the home dock and tied up, or received further orders; that if the boat had completed its journey, and carried out its last order, and was tying up to the dock, the jury should determine whether the employé was engaged in interstate commerce by determining what his employment was immediately prior to the time he was tying up; that if his act of tying up was part of the execution of a further order, or an incident in the execution of a further order, his employment was to be determined by the nature of such order; that there was evidence that the tug was to take a float from Jersey City to a point in New York, but was directed to hold certain floats in position while another tug moved out the float that was to be taken to New York; that it was for the jury to determine whether the act of holding such floats in line was a part of the act of taking such tug to New York; and that, if it was, such act was interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27; Master and Servant, Cent. Dig. §§ 1133, 1134, 1136–1146; Dec. Dig. ☞291.]

5. MASTER AND SERVANT ☞288—ACTIONS FOR INJURIES—INSTRUCTIONS—APPLICABILITY TO ISSUES.

Where, in an action under the Employers' Liability Act for injuries to an employé on a railroad company's tugboat, the only negligence alleged was the negligence of a fellow servant in starting the tug while plaintiff was securing a line for the purpose of making the tug fast to a dock, the court properly refused to direct a verdict for defendant on the ground that plaintiff assumed the risk, as under the statute he did not assume the risk of injury resulting from the negligence of a fellow servant, and while he assumed the risks incident to the ordinary perils of navigation, injuries therefrom result from a pure accident, for which the law affords no relief, and the question was therefore whether the injury was caused by the particular negligence charged or by a pure accident, which was a question for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. ☞288.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. MASTER AND SERVANT ☞286, 289—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.**

Where, in an employé's action for injuries, fair-minded men might reasonably have drawn, from the conflict in the testimony, different conclusions concerning defendant's negligence and plaintiff's contributory negligence, these questions were properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050, 1089, 1090, 1092–1132; Dec. Dig. ☞286, 289.]

In Error to the District Court of the United States for the District of New Jersey; Thomas G. Haight, District Judge.

Action by Lawrence Jacobus against the Erie Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

George S. Hobart, of Jersey City, N. J., for plaintiff in error.
Warren Dixon, of Jersey City, N. J., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The questions presented for review are whether the federal Employers' Liability Act of April 22, 1908 (35 Stat. 65, c. 149 [Comp. St. 1913, §§ 8657–8665]), applied to the facts of this case, and, if so, whether there was sufficient evidence of negligence to warrant the submission of the case to the jury.

The defendant, the Erie Railroad Company, was a "common carrier by railroad" engaged in commerce between various states. Under the powers conferred upon it by the laws of the state under which it was organized, it transported freight beyond its lines of railway by running its cars loaded with freight upon floats built for that purpose, and moved and propelled them by tugboats in and about New York Harbor, from point to point in the state of New Jersey and from points in the state of New Jersey to points of connection and destination in the state of New York.

Lawrence Jacobus, the plaintiff, was on the 27th day of October, 1912, a servant of the defendant, and was employed as a deck hand on one of its tugs operated in the movement of traffic of the character stated. When he was in the act of securing a line to a bitt on the tug, which was approaching and making fast to a dock, the captain or another of his fellow servants, as it is contended, negligently caused the tug to be started without awaiting a customary signal from the plaintiff and without giving him warning, whereby his hand was caught between the line and the bitt and was injured. Suit was brought to recover damages for the defendant's negligence, upon its liability under the act of April 22, 1908, entitled "An act relating to the liability of common carriers by railroad to their employés in certain cases." 35 Stat. 65.

[1] The first question is whether the statute which defines the liability of a common carrier "by railroad" for injuries occasioned by the negligence of its employés, extends that liability for injuries so occasioned, not upon its railroad, but upon one of its tugboats engaged in the business of continuing or completing interstate traffic. The de-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fendant contends that, in using the expression "common carriers by railroad" in the title of the act, Congress cannot be presumed to have intended the statute to apply to common carriers by water, and that when a common carrier is continuing its business by boat it cannot be held to the liability imposed upon it as a common carrier "by railroad."

In considering the statute in connection with the history of congressional enactments upon the subject of employers' liability, it is clear that in limiting the statute of 1908 to common carriers "by railroad" Congress endeavored to avoid one of the constitutional objections made to the act of 1906 (Employers' Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297), and that it did not attempt or intend to define the instrumentalities upon which their liability for negligence should exist or by which it should be limited. The expression "by railroad" is but descriptive of the kind of common carriers to which the statute relates, distinguishes them from common carriers of other classes to which the act does not extend, and describes the kind of employers and employés who are respectively charged with and protected by its provisions, under the power of Congress to make such classifications and distinctions. Second Employers' Liability Cases, 223 U. S. 1, 52, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.

If the expression "common carriers by railroad," as used in the title of the act, is open to debate, the clear expression of the act itself with respect to carriers' liabilities in connection with the instrumentalities of railroad operation, including by enumeration boats and wharves, discloses that the scope of the act was intended to include the liability of carriers for their negligence, or that of their employés, occurring upon or in connection with those instrumentalities while engaged in interstate commerce. The trial court did not err in declining to hold as a matter of law that the act did not apply.

The defendant charges error to the court in refusing to direct a verdict in its favor upon the ground that the injury to the plaintiff did not occur "while" the defendant carrier was "engaging in commerce between" the states, or while the plaintiff was "employed by such carrier in such commerce," and excepts to the charge of the court in which consideration is given to movements of the tug prior to the accident and movements intended thereafter.

[2] It is established by the decisions that in enacting the Employers' Liability Act of 1908 Congress intended to confine the operation of the statute to injuries occurring when the *particular* service in which the employé is engaged is a part of interstate commerce, and that the test is whether the employé *at the time of his injury* was employed by a carrier then engaged in interstate commerce. Illinois Central R. R. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163. The principal question in this case therefore is: What was the nature of the work being done *at the time the plaintiff was injured?*

[3] The accident happened at the defendant's Jersey City dock, known as No. 8, at about 2 o'clock on the morning of October 27, 1912. The tugboat upon which the plaintiff was employed had been engaged throughout the preceding evening in moving the defendant's traffic

from and to various points in New York Harbor. At about 11:30 o'clock of the night of the accident, according to the contention of the defendant, the tug moved light from Dock 8, Jersey City, known as the headquarters dock, or the home dock, of the tug, to Dock 2, Jersey City. It then moved a barge from Jersey City to Brooklyn, and then proceeded light from Brooklyn to Pier 7, East River. It then proceeded upon its last, and for the purpose of this case its important, movement, with a loaded float from Pier 7, East River, in the state of New York, to Dock 4, Jersey City, in the state of New Jersey. After delivering the float at the pier last named, it is claimed that the tug completed its interstate trip, ceased to engage in interstate traffic, and in default of further orders moved light from Dock 4 to Dock 8, its home dock in Jersey City, the two docks being distant one from the other about 100 yards, there to await further orders. It was while the tug was being tied up at Dock 8 on the last movement that the accident occurred.

The testimony given by the plaintiff discloses a movement of an altogether different character. According to this testimony, after moving traffic about New York Harbor throughout the evening, the tug proceeded with barges of freight from the terminal of the defendant at Weehawken, in the state of New Jersey, to the Bush terminal in Brooklyn, in the state of New York, and there left some of the barges, and with the balance proceeded to Staten Island, in the state of New York, and there left the remainder of the barges, and then proceeded light directly to Pier 8, the home dock in Jersey City, in the state of New Jersey, for the purpose of executing further orders. Upon the part of the plaintiff there is testimony that the tug went to Dock 8 in Jersey City, state of New Jersey, for the purpose of taking another tow from Dock 8 in Jersey City to Staten Island, in the state of New York.

Upon approaching Dock 8 the tug blew for the tug dispatcher, by whose orders the movements of the tug were controlled, in response to which the dispatcher called that the float was not ready, and the captain proceeded to turn around and back into the slip, and the accident happened in the act of making fast. The question therefore arose, under the two lines of testimony, whether at the time the plaintiff was injured the tug was engaged in interstate commerce.

[4] In instructing the jury upon this point the learned trial judge said:

"That one of the important questions to be considered is whether or not this act applies to this case, and therefore whether the plaintiff can recover in this action, because he can only recover if by the facts in the case as divulged by the evidence this act applies. In this connection I charge you that, in order to permit a recovery in this case, the plaintiff must have shown you by the greater weight of the evidence that at the time of the injury he was employed in interstate commerce; that means commerce or transportation between different states."

The remaining instructions of the learned judge, assigned by the defendant as error, are as follows:

"The determination of what is the true fact at just that particular time may not be so important as it would seem at first, though it may be important;

as I will charge you, regarding the application of this statute—as to whether the plaintiff at the time of the injury was employed in interstate commerce—first, that if this boat was engaged in towing or in otherwise transporting any articles of commerce from one state to another, the plaintiff was engaged in interstate commerce, and this engagement did not end until that particular job had been completed, and that it was not completed, if he had any further orders to execute, until he had returned to the dock in Jersey City, *or his headquarters*, if it was necessary to return there in order to execute the additional order, or if this ship was sent on a mission of transporting an interstate shipment, or any article of commerce, no matter what it might be, from the state of New Jersey to the state of New York, and if it had no further orders then as to where to go, or anything further to do that could be said to be the beginning of the execution of a new order, *the plaintiff was still engaged in interstate commerce until he came back to Pier 8 in Jersey City and tied up or received further orders.* Now, then, the importance of ascertaining exactly what the situation of the parties immediately prior to the accident was is this, and this, I charge you, is the rule of law which will govern you: If you find that the boat, at the time of the receiving of the injury by the plaintiff, had completed its journey and had carried out its last order, and was then tying up to the dock, you should determine whether he *was then engaged in interstate commerce by determining what his employment was immediately prior to the time he was tying up.* If his employment before that was in interstate commerce—that is, transporting something from a place in one state to a place in another state—then his employment in that respect was not complete until he had moored the boat to the dock; that was the end of that order, and the completion of the duties assigned to him. But if, on the other hand, his act of tying up was part of the *execution of a further order*, or an incident in *the execution of a further order*, then his employment at the time of tying up needs to be determined by the nature of the order of which it was a part.

"The defendant's story, as I have stated, is that the boat came from Pier 7, East River, to Pier 4, in Jersey City, and there received another order to go up to Pier 8, and there await further orders. If it had completed, upon its arrival at Pier 4, the journey from New York over to Jersey City, and its act of going to Pier 8 and there tying up (I am speaking of the boat) was a part or an incident of a further employment that was to follow, then you will determine the nature of his employment, while tying up, by the character of the act he was to do thereafter, and of which the act of tying up was a part. To make clear what I mean, let me illustrate: Assume that this boat had gone from Jersey City to New York, towing freight barges, freight floats, or what not, on its way back to Jersey City, still engaged in interstate commerce under my ruling, received an order from the tug dispatcher, while in the middle of the river, to go to Weehawken, from the time they received that order and attempted to execute it, they were then engaged in the kind of employment that that order required of them, and if it was for the purpose of making a shipment from one part of a state to another of the same state, it was not interstate commerce, and they would not then be engaged in interstate commerce.

"The evidence of the defendant is, as I recall it, that the next thing they did after they came to Pier 8 and tied up, pursuant to the tug dispatcher's instructions, was to take a float from Jersey City to some dry dock in Staten Island, with this exception: That, as part of that employment, immediately prior to that, they were directed to hold certain floats in line, or in position, while another tug moved out the float which they were to take to Staten Island. It is for you to determine from the evidence whether or not the act of holding these tugs in line was part of the further act of taking the float from Jersey City to Staten Island. If it was, then the act of holding those tugs in position was part of the greater act of moving the float from Jersey City to Staten Island, which would be interstate commerce."

We see no error in these very careful instructions upon the law. To be sure, evidence of what the tug was doing before the accident, or

what she intended to do after the accident, was relevant only as it bore upon the question of what she was doing at the time of the accident, and it is clear that the learned judge directed the minds of the jurors to these inquiries only that they might be enlightened upon the character of the employment of the tug and the particular service of the employé at the time the injury was inflicted. Without such light it would have been impossible for the jurors to determine whether the tug and the plaintiff were then engaged in interstate or intrastate commerce.

What the tug was doing at the instant of the accident was simply tying up to the wharf; but the character of the trip which she was completing, or the character of the trip which she contemplated, depended, of course, upon what she had done just before, or what she intended to do just subsequent to, the time of the injury. The thing which she had immediately done, or intended immediately to do, was pertinently and properly charged by the court, in order to determine the character of the thing she was then doing. In other words, in order to ascertain whether she was engaged in interstate or intrastate commerce, and therefore whether redress for the injury done was within or without the act, it was necessary to determine whether her presence and the act of tying up to the dock constituted the last act in a transaction of interstate commerce or the first act preliminary and necessary to such a transaction.

We are of opinion that the learned trial judge committed no error in declining to rule as a matter of law that at the time of the accident the plaintiff was not employed, and that the defendant was not engaged, in interstate commerce, and in submitting to the jury the question whether at the time of the accident the plaintiff was so employed, and the defendant so engaged.

[5] We find no error in the refusal of the trial judge to direct the jury to render a verdict for the defendant upon the ground that the plaintiff assumed the risk of the injury he sustained.

There are only two kinds of risks which we can conceive might have been assumed by the plaintiff in entering or continuing in the service of the defendant. The first are the risks incident to the ordinary perils of navigation, assumed by all who follow that occupation. They relate to the habits of tackle and appliances, the motion and behavior of craft under conditions which maintain upon tidewater and on streams, and under the varying conditions of atmosphere and climate. Injuries from such perils are not caused by the negligence of any one. They are rather the result of what is termed pure accident, for injury from which the law affords no relief.

The other risks assumed by the plaintiff were those which existed at common law, except the risk of injury resulting from the negligence of a fellow servant, from the assumption of which the plaintiff in this case was saved by the statute under which he brought his action. As the plaintiff declared upon but one act of negligence, and that was the negligence of a fellow servant, the risk of which he did not assume, the question resolved itself into the simple proposition: Was the plaintiff's injury occasioned by the particular negligence charged, or was it the re-

sult of pure accident? The solution of such a question properly rested with the jury.

[6] Assuming that the jury found that the federal Employers' Liability Act applied to this case, we are of opinion that the evidence in proof of the negligence charged is sufficient to sustain the verdict found, and that in any event from the conflict in the testimony fairminded men might reasonably have drawn different conclusions concerning the negligence of the defendant and the contributory negligence of the plaintiff, and therefore in pursuance of this rule the trial court committed no error in submitting the questions of fact for the determination of the jury.

The judgment below is affirmed.